FILED

2006 Jul-31  AM 07:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **JOHNS MANVILLE, on behalf of itself and all others similarly situated,** | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | |
| **VS.** | ) | **2:99-CV-2294-VEH** |
| | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## AMENDED MEMORANDUM OF DECISION

The court has before it plaintiffs' October 13, 2005 (doc. #188) and defendant's October 14, 2005 (doc. #182) cross-motions for summary judgment. The motions were deemed submitted without oral argument.

The court is issuing an amended memorandum of decision and an amended order in this case pursuant to defendant's motion (doc. #207) to amend the April 18, 2006 order, which the court is treating, in part, as a motion to reconsider.

## I. Procedural History

Plaintiff Birmingham Steel Corporation commenced this action on August 31, 1999 by filing a class action complaint in this court on behalf of itself and all others similarly situated, alleging that defendant Tennessee Valley Authority

("TVA") breached its power supply contracts by overcharging the class of industrial customers.  (See Compl.)  The class was certified on December 5, 2000 (doc. #27).  At the suggestion of the parties, the court endorsed a bifurcated trial: a trial would first be held on the issue of liability and then a trial would be held on damages only if the defendant was found liable.  On September 28, 2001, the court approved the notice that would be sent to potential class members (doc. #43), which specifically contained a statement that customers who are in bankruptcy would not be included in the class.  Subsequently, Birmingham Steel Corporation filed a petition for Chapter 11 bankruptcy, and the TVA brought this fact to the court's attention, seeking to decertify the class.  Birmingham Steel Corp. v. Tenn. Valley Authority, 353 F.3d 1331, 1333 (11th Cir. 2003).  The district court did decertify the class, and Birmingham Steel appealed to the Eleventh Circuit, which held that the district court should have allowed class counsel a reasonable period of time to substitute a new class representative before decertifying the class.  Id. at 1342-43.  Thus, Johns Manville was substituted as the named class representative on June 9, 2004 (doc. #128).

Plaintiffs' October 13, 2005 motion for partial summary judgment asserts that there are no genuine issues of material fact and that plaintiffs are entitled to

judgment as a matter of law with regard to the issue of liability.[1]  (See generally

Pls.' Mem. Supp. Summ. J.)  Defendant's October 14, 2005 motion for summary

judgment asserts that there are no genuine issues of material fact and that

defendant is entitled to judgment as a matter of law with regard to the issue of

liability.  (See generally Def.'s Mem. Supp. Summ. J.)  On October 13, 2005,

plaintiffs filed a memorandum of law (doc. #188) and evidence (docs. #189-91) in

support of their motion.  On October 14, 2005, Defendant filed a brief (doc. #183)

and evidence (docs. #184-87) in support of its motion.  On November 3, 2005,

defendant also filed a brief (doc. #194) and evidence (docs. #195-96) in opposition

to plaintiffs' motion, and plaintiffs filed a brief (doc. #197) and evidence (doc.

#198) in opposition to defendant's.  Plaintiffs then filed a reply brief (doc. #199)

to the opposition on November 14, 2005, and defendant filed a reply brief (doc.

#200) on November 15, 2005.  The court has considered all of the briefs and the

evidence.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[1] Federal Rule of Civil Procedure 56(c) explicitly allows for partial summary judgment:
"A summary judgment, interlocutory in character, may be rendered on the issue of liability alone
although there is a genuine issue as to the amount of damages."  Fed. R. Civ. P. 56(c).

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that the moving party believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and, by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Chapman, 229 F.3d at 1023.  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary

4

judgment may be granted.  <u>Anderson</u>, 477 U.S. at 249-50.  The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115-17 (citing <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428 (11th Cir. 1991) (<u>en banc</u>)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact (i.e. facts that would entitle it to a directed verdict if not controverted at trial).  <u>Fitzpatrick</u>, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to

affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the nonmoving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[2]

The plaintiff class consists of industrial customers of defendant Tennessee

---

[2] When considering a single motion for summary judgment, if the facts are in dispute, the court states them in the manner most favorable to the nonmoving party.  See Fitzpatrick, 2 F.3d at 1115.  However, because both parties are movants in this case, the facts will be presented both ways: as favorable to the plaintiffs when considering defendant's motion and to the defendant when considering plaintiffs' motion.

Valley Authority ("TVA") who contracted to purchase Economy Surplus Power

("ESP") from defendant during the summer of 1998.  Defendant supplies

electricity to the named class member, Johns Manville, through its distributor,

Athens Utility Board, for Johns Manville's fiberglass manufacturing facilities

located near Etowah, Tennessee.  The ESP program, which was first implemented

in 1986, was one of several ways in which TVA could provide an interruptible

power supply to industrial customers, allowing them to pay a lower average rate

for their power.[3]  (Boston Decl. 2000 ¶¶ 13-14.)  The ESP program allowed

industrial customers "to purchase interruptible power with charges varying from

hour to hour based on TVA's real-time 'incremental cost' of providing ESP in

each hour."  (Id. ¶ 14.)  As of July 1999, TVA had approximately 60 directly

---

[3] In his 2000 declaration. Terry Boston, executive vice president of TVA's transmission and power supply group, succinctly explained the reasons why TVA implements such pricing programs:

> Depending upon their particular needs and manufacturing processes, industrial customers, unlike residential and commercial customers, often can tolerate various levels of interruptibility in their electric service.  The option to interrupt large blocks of power, which TVA often obtains from large industrial loads under various agreements and programs, confers substantial operational savings upon the TVA system.  While TVA must plan for firm power (needed by residential and commercial customers) to be available on demand at all times, interruptible load provides an important tool for dealing with times of heavy system demand because customers are contractually required to suspend interruptible power takings to the extent provided in their contracts and deemed necessary by TVA. Because TVA retains the rights to interrupt the power supply, such power can be priced at a lower average rate than firm power.

(Boston Decl. 2000 ¶ 13.)

served customers and 345 distributor-served customers who took advantage of the ESP program.  (Id.)

Johns Manville signed its first contract for ESP in 1993.  (Def.'s Ex. 32.) The contract had a five-year term and expired on May 18, 1998.  (Def.'s Ex. 45.) The contract that was in effect during the summer of 1998 was signed in August 1998 and backdated to May 18, 1998 to avoid a gap between the expiration of the previous contract and the execution of the new one.  (Def.'s Ex. 47; Monteen Dep. at 87, 99.)  From May 18, 1998 until Johns Manville signed the new contract, TVA billed Johns Manville under the provisions of the 1993 contract.  (Def.'s Ex. 52.)  Once the new contract was signed, TVA retroactively billed Johns Manville under the new pricing provisions.  (Id.)  The contracts between plaintiffs and defendant were drafted by TVA, and the pricing provisions could not be negotiated by individual ESP customers.[4]  (Monteen Dep. at 125, 127; Medford Dep. at 148; Fogel Dep. at 69, 72.)

William Gehrlein worked as an independently contracted power consultant for Johns Manville from 1992 through 2005.  (Gehrlein Dep. at 37-38.)  Initially, he was working with them through Fogel & Associates along with another energy

---

[4] ESP customers could, of course, select which ESP option they wanted.  (Medford Dep. at 148; Fogel Dep. at 69-70.)

consultant, Ron Fogel, and later he worked with them alone as Gehrlein &
Associates.  (Id. at 26-28.)  Gehrlein and Fogel presented a risk assessment
regarding ESP power to Johns Manville in 1992.  (Id. at 29-31, 62; Def.'s Ex. 35.)
Defendant claims that this assessment included an explanation that TVA
sometimes had to purchase off-system power when it did not have enough
internally generated power and that the costs of these off-system purchases would
be passed on to ESP customers.  However, Fogel and Gehrlein never specifically
mentioned forwards in their assessment.  In addition to providing such
assessments, Gehrlein also advised Johns Manville of energy changes on a regular
basis.  Both in a fax to Paul Kessler, the company's ESP contact, and in a
newsletter he sent out to all of his consulting clients, he informed them of a 4-mill
adder TVA was charging for operational costs.  (Def.'s Ex. 37; Def.'s Ex. 38.)

The 1998 contracts at issue in this case contained an ESP attachment, which
provides in pertinent part:[5]

> Price.  The ESP energy price for any hour shall be calculated using
> TVA's actual hourly incremental cost per kWh of providing ESP to
> all consumers during that hour (Incremental Cost), the appropriate
> markup and adder (if any) determined from the table at the end of this

---

[5] The amount of electricity at any point in time delivered by the TVA and used by its
customers is called the **demand** or **load**.  (Boston Decl. 2005 ¶ 11.)  Demand is generally
measured in kilowatts or megawatts.  (Id.)  A kilowatt or megawatt is a unit of power demanded
at any particular point in time.  (Id.)  A megawatt or kilowatt hour is a unit of energy and is
equivalent to a megawatt or kilowatt used over the course of an hour.  (Id.)

attachment, and an additional markup factor of 1.053.

The price for each kWh of each ESP Option deemed to have been taken in any hour shall be the sum of:

(a) the lower of (i) the Incremental Cost for that hour multiplied by the applicable Markup Factor for that ESP Option from column 1 of the table or (ii) such Incremental Cost plus the applicable Maximum Markup amount for that ESP Option from column 2 of the table; and (b) the adder for that ESP Option, if any, from column 3;

multiplied by 1.053.  For purposes of determining Incremental Cost, the ESP load will be deemed to be that load immediately above TVA's firm (including limited firm), 5 percent interruptible, and limited interruptible power loads.

The summation of all hourly energy charges for ESP in the month will be Company's monthly energy charge for ESP for the month.  In addition to the ESP energy charge, Company shall pay each month the per kW charge (kW charge) for each ESP Option available under this contract that is equal to the per kW amount for that Option from column 4 of the table, applied to the highest <u>ESP Demand</u> established for that Option in the month.

(Pls.' Ex. C.) (emphasis in original).

The table at the end of the ESP attachment provided as follows:

| ESP Option | Markup Factor | Maximum Markup | D & E Adder | kW Charge | Suspension Notice Period |
|---|---|---|---|---|---|
| ESP Option A | 1.15 | 7.5 mills | 0 | $1.21 | 5 minutes |
| ESP Option B | 1.25 | 12.5 mills | 0 | $1.21 | 5 minutes |
| ESP Option C | 1.35 | 17.5 mills | 0 | $1.21 | 60 minutes |
| ESP Option D | 1.15 | 7.5 mills | 8 mills | $1.21 | 5 minutes |

10

| ESP Option E | 1.25 | 12.5 mills | 8 mills | $1.21 | 60 minutes |
|---|---|---|---|---|---|

During 1998, TVA's source for determining incremental costs was the

Block Pricing Compendium ("BPC").  (Whitley Dep. at 304; Pls.' Ex. P.)  The

BPC is a software program developed by TVA as a real-time tool for operating the

power system.  (Whitley Dep. at 248.)  The BPC software measures what

resources are being used as well as the quantity and cost of those resources.

(Walker Dep. at 142.)  The BPC system is based upon and operates under the

principle of economic dispatch, which allows TVA to meet varying levels of

demand for power each day in the most economical manner possible:

> Economic dispatch is the term for a method used by TVA . . . to
> utilize available generation resources (including purchased power) to
> supply a given load in the most economic manner.  The decision to
> use a generation resource during power system operation is called the
> "dispatch" of that resource, and resources that are available to the
> system operator in an economic dispatch system are called
"dispatchable" resources.  The objective of economic dispatch is to minimize the
total power supply cost (including fuel cost, emission costs,
operation/maintenance costs, and transmission costs, and purchases of interchange
power) to supply a given load.
(Boston Decl. 2005 ¶ 24.)

> The TVA system operator's objective is to meet the expected load in
> each and every hour at the lowest possible cost.  To achieve this
> objective, the system operator (also called the "balancing authority")
> increases or decreases the output of dispatchable power supply
> resources based on their incremental operating cost until the total
> power supply is matched with the load.  When an increase in power is

> needed, the system operator increases the output of the resource with the least expensive incremental cost.  When a decrease in power is needed, the system operator reduces the output of the resource with the most expensive incremental cost.

(Id. at ¶ 31.)

Put more simply:

> TVA has several sources of power, such as: hydroelectric; coal-fired steam plants; gas-fired plants; nuclear plants; and purchased off-system power generated outside of TVA.  In economic dispatch, TVA stacks these power sources from least expensive to most expensive, and attempts to use the less-expensive sources first.  The "incremental" cost of a megawatt hour goes up as the least-expensive power sources are exhausted and the "actual hourly incremental cost" of an ESP hour creeps up the stack toward higher-priced sources.  TVA's firm power customers get served first, then the ESP hours are stacked on top of that.  Thus, the price per hour can vary considerably, depending on the demands being placed on TVA by its firm power customers during a particular hour (like 5 p.m. on a hot summer day).

(Def.'s Ex. 8.)

This method of using lower-cost power first is called the lambda method, and "system lambda" is the economic dispatch model's incremental cost at the current demand level.  (Boston Decl. 2005 ¶¶ 30-31.)

Prior to 1997, when the TVA needed to purchase power for its ESP program, it was generally assumed that the system operator could buy electricity by the hour on the day and hour it was needed. (See Whitley Dep. at 58-61.) However, changes in the wholesale electricity market initiated by the Federal

Energy Regulatory Commission ("FERC") began to make it difficult to purchase power on an as-needed hourly basis.  (Id. At 62-64.)  Instead, power was being bought in the form of "forwards," blocks of power purchased for one or five days for 16-hour periods each day.  (Id. at 65.)  Essentially, forwards are an advance purchase of additional power.  (Windschitl Dep. at 164.)  Forwards have a fixed price based on a market average that is not tied to production costs.  (See Boston Dep. at 40; Stansberry Dep. at 106-07.)  TVA purchased them at one blanket cost instead of on an hourly basis.  (Owens Dep. at 95.)  Once TVA contracted to purchase a forward, it was obligated to purchase the entire forward block whether it needed all of it or not.  (Stansberry Dep. at 105-07; Owens Dep. at 158.)

TVA first began purchasing forwards in the summer of 1997.  (Whitley Dep. at 78-79.)  At that time, the ESP pricing system stayed the same, and the cost of the forwards was not passed on to ESP customers.  (Id. at 79-80.)  By 1998, it had become apparent to TVA that, because of the changes in the market, hourly power might not be available and, even if it were, it would be more expensive than purchasing a forward.  (Boston Decl. 2005 ¶ 50; Whitley Dep. at 62-64.)

On February 9, 1998, a presentation on forward adders was made to the TVA executive committee.  (Boston Dep. at 44-45.)  The presentation identified the problems with forwards as they related to TVA's ESP revenue:

- To mitigate ESP interruptions, firm & non-firm "forward" purchases must be secured.
- These purchase prices are not passed on to the ESP customers.
- In FY 1997, this resulted in a marginal loss of about $16.5 Million to TVA. This loss is projected to be slightly higher in 1998.

(Pls.' Ex. T.)

The "solution" was identified as follows:

- Apply an adder to the hourly inc. cost charged to the ESP customer that would cover the additional "forward" or "firm" purchase costs serving the ESP load.
- This would add approx. $3-4/MWh to the ESP revenue rate for June-August 1998.

(Id.)

During the spring of 1998, it was projected that the wholesale electricity market during the summer would be unusually tight, which would likely increase suspensions of power to ESP customers unless TVA purchased additional power supplies. (See Whitley Dep. at 77-78; Boston Decl. 2000 ¶¶20-22.) In March and May of 1998, TVA representatives met with the Tennessee Valley Industrial Committee ("TVIC"), a trade organization representing many of the ESP customers, to discuss the potential power shortages and the necessity of purchasing forwards to avoid major interruptions. (Boston Dep. at 54-57; Whitley Dep. at 114-18.) In April 1998, TVA representatives also met with Associated Valley Industries ("AVI"), another trade association representing many of the

distributor-served ESP customers, TVA power distributors, and individual ESP

customers, to discuss the anticipated power situation for the summer.  (Boston

Dep. at 67-71.)  At some point during the spring of 1998, TVA decided to

incorporate a "forward adder" into the incremental cost it charged ESP customers.

(See Stansberry Dep. at 106-09; Whitley Dep. at 88-89; Windschitl Dep. at 83-85.)

In late June 1998, market prices to purchase power on an hourly basis ranged from

$20/MWh to over $5,000 MWh.  (Boston Decl. 2000 ¶ 25.)  TVA claims that it

purchased forwards only for use on days they were needed to avoid suspension of

ESP availability, but plaintiffs dispute this claim.  (Boston Decl. 2005 ¶ 62.)

On June 10, 1998, Athens Utility Board sent letters to both Leo Radkowski,

Johns Manville's energy supply manager at its headquarters in Denver, and Paul

Kessler, senior project engineer for the Etowah plant and the plant's ESP contact,

informing them of the power supply difficulties that had arisen that summer and

that TVA would be purchasing forwards as a result of the high market prices for

hourly power.  (Def.'s Ex. 39; Def.'s Ex. 40.)  The letters, which were identical,

read in pertinent part:

> In response to changing market conditions and in order to best
> attempt to minimize the number of ESP curtailments which might be
> necessary, TVA will from time-to-time, and probably with increasing
> frequency, be relying upon forward purchases, rather than hourly off-
> system purchases to serve ESP load.  The costs of such purchases are

actual costs incurred by TVA in supplying the ESP loads.

Any increased costs so incurred to serve ESP load will be calculated by TVA for each forward purchase and be included in the ESP energy price for the hours in which that purchase is determined to have resulted in increased incremental costs of serving ESP load.  This calculated amount will be included at the earliest feasible time in the ESP price estimates that you receive.  With this pricing information, you will be able to make your own decision about whether to pay the costs incurred by TVA in making forward purchases necessary to supply ESP load or to voluntarily reduce load.

(Id.)

The parties dispute how the forward adder was included in the cost, although the differences seem to be largely semantic.  Plaintiffs claim that it was added to the incremental cost as a different component of the total price ESP customers were charged.  (See Whitley Dep. at 107-08.)  Defendant claims that the adder was part of the actual hourly incremental cost per kilowatt hour of providing ESP during that hour.  (See Boston Decl. 2005 ¶¶ 62-64.)  Regardless of how it was added, the total cost of the ESP forwards was spread over 16 hours from May 28, 1998 to July 26, 1998.  (See Fogel Decl., Ex. B, C.)  After that date, the total cost of ESP forwards was spread over 8 hours.  (See id.)

The parties also dispute whether TVA charged ESP customers a higher price during certain hours than the actual cost for the load immediately above firm, limited interruptible, and 5 percent interruptible customers.  Plaintiffs contend

they did.  (Whitley Dep. at 149-50.)  Defendant claims that the charge was not

higher than the actual cost because forwards were a part of the actual cost.  (See

Boston Decl. 2005 ¶¶ 62-67.)  TVA admits, however, that it charged the forward

adder even for hours in which forwards were not necessary to serve the entire ESP

load because it had to purchase the forwards in 16-hour blocks.  (Windschitl Dep.

at 291-92.)  The result was that even for hours when TVA had sufficient power

resources to supply the ESP load without forwards, the cost of forwards were

being passed along to its ESP customers.  (Owens Dep. at 132-33.)  This typically

allowed TVA to sell its own excess power to users outside its system, which cost

TVA less than what it was charging its ESP customers using the forward adder

and allowed TVA to make a profit on selling off-system power.  (Whitley Dep. at

150-52.)  An hourly chart submitted by TVA indicates that there were at least 514

hours out of a total 708 hours of power during which TVA could have met the

ESP load without purchasing forwards.  (Pls.' Ex. W.)

 According to TVA, it realized $20.9 million in revenue from hourly off-

system power sales it made between June 1, 1998 and July 26, 1998.  (Def.'s Ex. 4

at 8-9.)  Its actual gain on those sales was approximately $12.6 million.  (Id. at 10.)

TVA concluded that approximately $8.4 million of that gain was a result of

forwards purchased for its ESP customers.  (Boston Decl. 2000 ¶ 28.)  TVA

rebated this sum to its ESP customers in the fall of 1998 based on their usage during the hours for which forwards were purchased.  (Id.; Def.'s Ex. 4 at 10.)

For the summer of 1999, TVA added the Forward Supported Power program ("FSP") as an optional enhancement to the ESP program.  (Boston Decl. 2000 ¶ 32.)  ESP customers may elect to participate in FSP on a monthly basis. (Id. at ¶ 33.)  Under this optional program, TVA purchases forwards for FSP participants for periods that are anticipated to have tight power supplies, and the FSP customers' hourly charges reflect the purchase of those forwards.  (Id.) Under this new system, TVA no longer purchased forwards for ESP customers unless they specifically enrolled in the FSP program by executing the necessary documents.  (Id. at ¶ 34; Windschitl Dep. at 196.)

### IV. Applicable Substantive Law and Analysis

Plaintiffs' complaint alleges that (1) TVA breached its contract with its ESP customers by failing to honor the pricing provision, and (2) TVA was unjustly enriched by extra profits it acquired as a result of overcharging its ESP customers. Plaintiffs' motion for summary judgment, as amplified in their memorandum in support thereof, asserts that (1) the terms of the ESP attachment were unambiguous, and (2) TVA's charging a forward adder breached those terms. (See generally Pls.' Mem. Supp. Summ. J.)  Defendant's motion for summary

judgment, as amplified in its memorandum in support thereof, asserts that (1) the contract terms were unambiguous and allowed for the forward adder and (2) even if the contract terms were ambiguous, the court should defer to TVA's interpretation.  (See generally Def.'s Mem. Supp. Summ. J.)  Essentially, there are two issues in this case: (1) whether the ESP pricing provisions are ambiguous and (2) what those pricing provisions mean.

Contracts to which TVA is an original party are governed by federal contract law.  Stock Equip. Co. v. Tenn. Valley Auth., 906 F.2d 583, 585 n.1 (11th Cir. 1990).  In construing a contract, the court must first determine, as a question of law, whether the contract is ambiguous.  Steward v. Champion Intern. Corp., 987 F.2d 732, 734 (11th Cir. 1993); see also Miaz v. Virani, 253 F.3d 641, 658-59 (11th Cir. 2001); Hoover, Inc. v. McCullough Indus., Inc., 380 F.2d 798, 801 (5th Cir. 1967).  "The fact that the parties adopt conflicting interpretations in the throes of litigation does not create ambiguity where none exists."  Steward, 987 F.2d at 734.  If the contract's terms are clear and certain and unambiguous, the court next interprets the construction and effect of the agreement, which are also questions of law that may properly be decided on summary judgment.  Steward, 987 F.3d at 734.  However, if the court finds that a contract term is ambiguous, it may look to extrinsic evidence to interpret the ambiguity.  Moore v. Pa. Castle Energy Corp.,

19

89 F.3d 791, 796 (11th Cir. 1996).  Summary judgment may still be appropriate in this situation if the extrinsic evidence supports only one party's interpretation of the ambiguous term.  See, e.g., Adams v. Thoikol Corp., 231 F.3d 837, 844 (11th Cir. 2000); see also Stewart v. KHD Deutz of Am. Corp., 980 F.2d 698, 702-04 (11th Cir. 1993).  In general, when these contract principles fail to illuminate a meaning, an ambiguous contract term should be construed against the drafter. Global Satellite Commc'n Co., 378 F.3d 1269, 1271 (11th Cir. 2004).

First, this court must determine whether the ESP pricing terms in the contracts between TVA and its ESP customers are ambiguous.  In determining whether a contractual term is ambiguous, "the words should be given their natural, ordinary meaning, and ambiguity does not exist simply because a contract requires interpretation or fails to define a term."  Key v. Allstate Ins. Co., 90 F.3d 1546, 1549 (11th Cir. 2003).  A contract is only ambiguous "when a term is reasonably susceptible to more than one interpretation."  Westport Ins. Corp. v. Tuskegee Newspapers, Inc., 402 F.3d 1161, 1164 (11th Cir. 2005) (internal quotations omitted); Stewart, 980 F.2d at 702.  In order to establish whether there is ambiguity, the court looks first to the language of the contract itself.  Stewart, 980 F.2d at 702.

After careful examination of the contract, the court agrees with the parties

that the ESP pricing provision is not ambiguous.  The contract explicitly states that

ESP prices will be calculated using various combinations of four numbers,

depending on which of the five ESP options a customer chooses: (1) "TVA's

actual hourly incremental cost per kWh of providing ESP to all consumers during

that hour," (2) the applicable markup found in the table included in the contract,

(3) the applicable adder (if any) found in that table, and (4) an additional,

predetermined markup factor of 1.053.  (Pls.' Ex. C.)  Forwards or forward adders

are not mentioned anywhere in this formula.  The contract goes on to explain that

"[f]or purposes of determining Incremental Cost, the ESP load will be deemed to

be that load *immediately above* TVA's firm (including limited firm), 5 percent

interruptible, and limited interruptible power loads." (Id.) (emphasis added).  This

sentence may be easily interpreted according to its plain meaning and the

principles of economic dispatch, which are calculated for TVA by the BPC

system.  The plain meaning of "incremental cost," which the parties agree upon, is

the cost of the next unit, or increment, of power above the cost of meeting the

existing load, or current base cost.  According to the terms of the contract, the

incremental cost of providing power to ESP customers is the cost of the next

available unit of power after power is supplied to TVA's firm, 5 percent

interruptible, and limited interruptible customers.  How high TVA has to move up

its "power stack" to provide for the firm and limited interruptible customers thus determines the incremental cost for ESP customers.

For instance, residential and commercial customers might require a great deal of power on a very hot day in the middle of the summer.  In that case, ESP customers are going to be charged more because TVA had to move higher up the power stack to meet the higher demand.  If, on the other hand, residential and commercial customers use very little power on a given day, ESP customers will be charged less because TVA did not have to go up as high in the power stack.  The contract specifically states that the incremental cost for ESP customers will be set immediately above the highest cost that is necessary to supply power to TVA's firm, 5 percent interruptible, and limited interruptible customers.  In other words, if the cost were measured in whole dollars, if TVA supplies its firm, 5 percent interruptible, and limited interruptible customers at $9 per kilowatt hour on a given day, it must charge its ESP customers $10 per kilowatt hour and cannot jump to $15, assuming there is a $10 per hour power source available that day.[6]

TVA relies heavily on the term "system lambda"[7] and the distinction

_____

[6] This is merely an illustration and not an approximation of actual energy costs.  This is assuming, of course, that there is a power source available for $10 per kilowatt hour.  If $15 per hour represents the next available power source, it would be permissible for TVA to charge $15.

[7] TVA's reliance on this concept is perplexing in light of Whitley's deposition testimony: "We didn't really use [system lambda] at TVA either.  It was just a reporting definition that we

22

between that term and "incremental cost," claiming that plaintiffs are equating incremental cost with system lambda when incremental cost can really include system lambda and any other operational costs TVA chooses to include.  This argument is irrelevant to a plain reading of the contract language.  Whether it is called system lambda or something else, the incremental cost must be based on the load immediately above the firm, 5 percent interruptible, and limited interruptible customers.  Under the terms of the contract, incremental cost cannot be based on the cost immediately above these loads plus any other costs TVA decides to pass on to its ESP customers.

A plain reading of the contract also requires TVA to charge the ***actual*** hourly incremental cost of providing power to its ESP customers during a particular hour.  It may not use a predicted or estimated hourly cost.  Thus, if, as in the above example, it ***actually*** cost TVA $10 to provide power to its ESP customers during a particular hour, it cannot charge its customers a $15 incremental cost.  It must use its actual cost, $10 per kilowatt hour, in the mathematical formula along with the appropriate markup and adder to arrive at the total cost.  The contract says absolutely nothing about including a forward adder, or any other adder besides the one listed in the table, in this formula.

_____

had to report back to FERC every year for many, many years."  (Whitley Dep. at 223-24.)

23

During the approximately 194 hours in which forwards were needed to provide power to ESP customers, TVA correctly billed those customers for the forwards.[8]  Plaintiffs appear to contend in their response to defendant's brief in support of its motion that they should not be charged for any electricity originating from forwards because forwards are not considered "dispatchable" power under the principle of economic dispatch but instead go to the bottom of the power stack, where the system operator must use them and does not have discretion.  (See Pls.' Resp. 29-32.)  This argument is contrary to the plain meaning of the contract.  The contract does not say that the incremental cost must be based on dispatchable resources.  It states that the price is based on "actual hourly . . . cost . . . of **providing** ESP to all consumers during that hour . . . ."  (Pls.' Ex. C.) (emphasis added).  Without the forwards, TVA would not have been able to provide power at all during those 194 hours.  Under a plain reading, defendant is correct in its assertion that the power costs did not have to be incurred during a particular hour.  Instead, they only had to be used during the hour, and forward power was used during those 194 hours in the summer of 1998.  Thus, the cost of the forwards

---

[8] The court recognizes that the number of hours for which TVA may have breached the contract probably is more probative to the question of damages.  The court discusses it here only to the extent it is illustrative in discerning the meaning of the contractual provisions at issue and hence the issue of liability.

should have been part of the actual cost for those hours.  To decide otherwise would be an unreasonable interpretation.  During the approximately 514 hours in which TVA did not need forwards to provide power for its ESP customers, however, forward power was not part of the *actual* cost but was instead part of an estimated or projected cost that TVA was trying to recoup because it chose to purchase forwards in advance.

Further, TVA could have drafted the contract to account for the unexpected costs of the forward adders.[9]  TVA explicitly reserved the right to "increase or decrease (a) the Markup Factor, (b) the Maximum Markup amount, or (c) the kW Charge for any Option set out in the table to assure TVA of such cost recovery as the TVA Board determines to be necessary to meet the then-existing circumstances" upon 60 days' written notice to affected ESP customers.  It could have inserted a similar provision to cover the costs of forwards, but it chose not to do so.

In summary, the contracts between TVA and its ESP customers clearly delineate all of the factors that make up the total price the customers will be

---

[9] TVA claims it has discretion in pricing because of section 2.2 of the main contract (not the ESP attachment), which states that TVA "shall make available ESP Option A in such amounts as TVA, in its judgment, is able to supply, up to and including 8,750 kW."  (Pls.' Ex. C.)  This argument is clearly misplaced.  This provision has nothing to do with pricing, and this case is about whether TVA breached the *pricing* provisions of the contract.

charged.  The contracts state how to calculate the variable factors and incremental cost and contain a chart outlining the other costs.  TVA explicitly reserved the right to change a few of the non-variable factors.  It would be an unreasonable interpretation of this contract to allow TVA to circumvent the contractual provisions by adding various charges, in particular a forward adder, to the "incremental cost."  Accordingly, this court holds that the ESP pricing provisions are not ambiguous and that TVA breached those provisions by charging a forward adder during hours in which forwards were not needed to provide power to ESP customers.  However, this does not mean that plaintiffs prevail on their motion for summary judgment.

Defendant has asserted three affirmative defenses: estoppel, waiver, and voluntary payment.  Defendant claims that plaintiffs did not show these affirmative defenses were insufficient.  However, the burden is on the defendant to produce evidence supporting an affirmative defense and not upon plaintiffs to negate those defenses.  See Johnson v. Bd. of Regents of Univ. of Ga., 263 F.3d 1234, 1264 (11th Cir. 2001); Thorsteinsson v. M/V Drangur, 891 F.2d 1547, 1550-51 (11th Cir. 1990).  Summary judgment should be denied when a defendant presents a genuine issue of material fact as to any affirmative defense.  See, e.g., Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1314-15 (11th Cir. 2001);

Clark v. Union Mut. Life Ins. Co., 692 F.2d 1370, 1373 (11th Cir. 1982).

As noted above, contracts to which TVA is an original party are governed by federal common law because TVA is an instrumentality of the U.S. government. Stock Equipment Co., 906 F.2d at 585 n.1; see also Begner v. United States, 428 F.3d 998, 1004 (11th Cir. 2005) ("Federal courts use federal common law to evaluate government contracts.").  The Eleventh Circuit has explicitly recognized, however, that general principles of state law can inform the federal common law and that a court may select a rule of state law in such cases.  Begner, 428 F.3d at 1004-05.  This court will rely on Alabama law, the law of the forum in which it sits, because TVA is "an inhabitant and resident of the northern judicial district of Alabama within the meaning of the laws of the United States relating to the venue of civil suits," 16 U.S.C. § 831g(a), and because the parties appear to have based their arguments largely on Alabama law.[10]

Under the defense of voluntary payment, "'where one party, with full knowledge of all the facts, voluntarily pays money to satisfy the colorable legal demand of another, no action will lie to recover such a voluntary payment, in the absence of fraud, duress, or extortion.'"  U-Haul Co. of Ala., Inc. v. Johnson, 893

---

[10] The choice of Alabama law is really immaterial because the law of Tennessee is virtually identical in the area of these three affirmative defenses.  However, the court felt it would be helpful to choose a particular body of case law upon which to base its analysis.

So. 2d 307, 311 (Ala. 2004) (quoting <u>Mt. Airy Ins. Co. v. Doe Law Firm</u>, 668 So.

2d 534, 537 (Ala. 1995)).  Waiver is an intentional relinquishment of a known

right, which can be either express or implied by conduct that is inconsistent with

an intent to enforce the right.  <u>Dominex, Inc. v. Key</u>, 456 So. 2d 1047, 1058 (Ala.

1984).  Estoppel, on the other hand, may be asserted when (1) the plaintiff, having

actual or imputed knowledge of facts, "communicates something in a misleading

way, either by words, conduct, or silence, with the intention that the

communication will be acted on;" (2) the defendant relies upon the

communication; and (3) the defendant would be materially harmed if the plaintiff

is "later permitted to assert a claim inconsistent with his earlier conduct."  <u>Id.</u>

TVA claims that (1) in letters to both Leo Radkowski and Paul Kessler,

Johns Manville was informed that the cost of forwards would be passed on to ESP

customers, and (2) the company knew when it signed the contract in August 1998

and backdated it to May 1998 that it had been charged for forwards during the

summer.  TVA argues that because Johns Manville knew about the extra cost and

paid it anyway, it paid voluntarily, waived any possible breach on TVA's part, and

should now be estopped from asserting a breach of contract claim.  The key

element in all three of these affirmative defenses is plaintiffs' knowledge of the

forward adder.  TVA has produced somewhat questionable evidence that Johns

Manville knew it would be charged for forwards.  Although the letters to

Radkowski and Kessler indicate that ESP customers would be charged, they do

not make it clear whether ESP customers will be charged the entire price of the

forwards or just for the forward power they actually use.  In addition, the letters

indicate that ESP customers will be able to opt-out after receiving pricing

information on forwards, something that never actually happened.  While this

evidence is not overwhelming enough to grant summary judgment in favor of

defendant, it is enough to create a question of fact on defendant's affirmative

defenses, precluding summary judgment in favor of plaintiffs.

Assuming, *arguendo*,[11] that the pricing provisions were ambiguous, TVA

advances several arguments to support its interpretation of the contract.  As an

initial matter, TVA argues that its interpretation of the contract should be given

deference because TVA has statutory authority to set its own rates[12] and its power

contracts are akin to tariffs, which means the rate-maker's construction enjoys a

presumption of validity.  First of all, the court would like to once again clarify that

this is not a rate-making case, as Judge Johnson explicitly pointed out in her order

---

[11] This indicates that this section of the court's opinion is not the holding, but merely an
alternative analysis in the event that the court's holding is found, on appeal, to be wrong..

[12] <u>See</u> 16 U.S.C. § 831j; 16 U.S.C. § 831n-4(f).

denying TVA's motion to dismiss.  (doc. #13.) ("Upon review of the pleadings and

the briefs filed by all parties, the Court finds that Plaintiff has filed a complaint for

breach of contract, not a rate contest.")  Defendant is correct, however, that

agencies are generally entitled to a certain level of deference in interpreting

contracts germane to their specialties.  In Muratore v. U.S. Office of Personnel

Mgmt., 222 F.3d 918 (11th Cir. 2000), the Eleventh Circuit held that "*Chevron*

suggests that 'the institutional advantages of agencies apply to a broad range of

administrative activities,' and 'contract interpretation . . . is sufficiently similar to

statutory interpretation [that it] warrant[s] deference -- especially when the

interpretation involves a policy determination within the agency's statutory

domain.'"  Id. at 922 (quoting Phillip G. Oldham, Comment, *Regulatory Consent*

*Decrees:  An Argument for Deference to Agency Interpretations*, 62 U. Chi. L.

Rev. 393, 399-400 (1995)) (referring to Chevron U.S.A., Inc. v. Natural Res. Def.

Council, Inc., 467 U.S. 837 (1984)).

　　　　However, there is persuasive authority[13] that carves out an exception to

---

[13] The Eleventh Circuit has not had occasion to directly address the issue of whether an agency's self-interested interpretation of a contract to which it is a party should be granted Chevron deference.  In Muratore, the issue did not arise because the Office of Personnel Management did not have a financial interest in the health insurance contract between the employee and the insurance company.  Muratore, 222 F.3d at 920.  However, in Muratore, the Eleventh Circuit relied in part on Nat'l Fuel Gas Supply Corp. v. Fed. Energy Regulatory Comm'n, 811 F.2d 1563 (D.C. Cir. 1987), in holding that agencies should generally be afforded Chevron deference in contract interpretation, and that case suggests that such deference is

Chevron deference in cases where the agency itself is an interested party to the contract.  Nat'l Fuel Gas Supply Corp. v. Fed. Energy Regulatory Comm'n, 811 F.2d 1563, 1571 (D.C. Cir. 1987); see also Mesa Air Group, Inc. v. Dep't of Transp., 87 F.3d 498, 503 (D.C. Cir. 1996) (refusing to grant Chevron deference to the legal interpretation of an agency with a financial stake in that interpretation); Transohio Sav. Bank v. Dir., Office of Thrift Supervision, 967 F.2d 598, 614 (D.C. Cir. 1992) ("This Court has expressed concern about deferring to an agency interpretation of an agreement to which the agency is a party, and we think the same concern applies to an agency interpretation of a statute that will affect agreements to which the agency is party.").  In Nat'l Fuel Gas Supply Corp., which the Eleventh Circuit relied on in Muratore, the D.C. Circuit noted that

> [t]here may, of course, be circumstances in which deference would be inappropriate.  . . . if the agency itself were an interested party to the agreement, deference might lead a court to endorse self-serving views that an agency might offer in a post hoc reinterpretation of its contract.

Nat'l Fuel Gas Supply Corp., 811 F.2d at 1571.

As a policy matter, this court finds the D.C. Circuit's reasoning to be persuasive.  Agencies should not be able to use Chevron deference as an excuse to reinterpret their contracts after the fact in an effort to save money.  Accordingly, this court

---

inappropriate in cases where the agency is a party to the contract and has a financial stake.

holds that TVA should not be afforded <u>Chevron</u> deference in this case because it is

an interested party to the contract at issue.  Even without <u>Chevron</u> deference,

though, TVA has offered enough evidence to raise questions of material fact

precluding summary judgment for plaintiffs in the event that the contract is found

to be ambiguous.  It is not, however, sufficient to allow the court to grant summary

judgment in favor of defendant, even if the court were to hold that the contract was

ambiguous, which it does not.

   First, TVA argues that, prior to 1998, the actual hourly incremental cost had

three parts:  (1) system lambda, (2) a 4-mill adder, and (3) a fuel adder.  (Boston

Decl. 2005 ¶¶ 43-45.)  The 4-mill adder, which was 2.5 mills from 1992 until

1996, covered the extra costs of providing ESP that would not have been incurred

if TVA had only been serving its firm load (i.e. starting up units, keeping them

online, etc.).  (<u>Id.</u> at ¶ 44.)  The fuel adder was a negligible amount TVA added

periodically to pay for fuel costs that would not have been incurred to serve firm

load and that were not included in system lambda.  (<u>Id.</u> at ¶ 45.)  Plaintiffs counter

that these adders are irrelevant because they are not directly at issue in the instant

case.  On the contrary, prior performance and dealings between the parties is

probative extrinsic evidence if the contract language is ambiguous.  Restatement

(Second) of Contracts § 203 (1981) (extrinsic evidence for interpreting an

ambiguous term in a contract may include, in order of importance: (1) the parties'

negotiations; (2) their course of performance; (3) their prior course of dealing; and

(4) the term's trade usage in the relevant industry); see also Chase Manhattan

Bank v. First Marion Bank, 437 F.2d 1040, 1046 (5th Cir. 1971).[14]  Neither the 4-

mill adder nor the fuel adder was explicitly included in the 1993 contract that

governed pricing between 1993 and May 1998.  (See Def.'s Ex. 32.)  Despite the

fact that these adders were not included in the contract, defendant has produced

evidence that Johns Manville was aware or should have been aware of the 4-mill

adder in 1996.  (Def.'s Ex. 37, 38.)[15]  It has produced no evidence that Johns

Manville or the other plaintiffs had knowledge of the fuel adder.  While Johns

Manville's knowledge of the 4-mill adder[16] might not be enough to establish a

---

[14] Decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, Ala., 661 F.2d 1206 (11th Cir. 1981).

[15] Bill Gehrlein explained to Paul Kessler in a fax dated Sept. 5, 1996 that the TVA Board of Directors had made a recommendation "to increase the ESP 'adder' from 2.5 mills per kWh to 4.0 mills" and that the "change is within the terms of the existing ESP contract and is not a rate change." (Def.'s Ex. 37.)  Gehrlein also mentioned the 1.5-mill increase in a newsletter he sent to his clients in December 1996.  (Def.'s Ex. 38.)  However, in the same fax in which Gehrlein alerted Kessler that the adder was going to increase from 2.5 mills to 4 mills, he also informed him that TVA was eliminating an ESP surcharge.  (Def.'s Ex. 37.)  Therefore, even with the adder, ESP costs would go down.

[16] The court notes that the 4-mill adder and the fuel adder could be considered materially different from the forward adder because they represent the actual costs of providing power to ESP customers during a particular hour whereas the forward adders merely passed on costs for power that TVA projected it might need but did not actually need during 514 hours in the summer of 1998.

33

course of dealing, it is probative evidence of the course of performance between the two parties under a contract very similar to the one at issue. Johns Manville has offered no evidence that it was unaware of the 4-mill adder or that the 4-mill adder is in some way distinguishable from the forward adder under these circumstances.

As discussed above, defendant also asserts three affirmative defenses and has submitted enough evidence to create a genuine issue of material fact as to those defenses.

Plaintiffs' only argument based on extrinsic evidence is that defendant knew it was in breach when it charged a forward adder under the 1998 contract for two reasons: (1) TVA did not charge such an adder under the 1997 contract, which had terms similar to the 1998 contract, and instead absorbed the cost of forwards, and (2) TVA specifically outlined its method of charging for forwards in the 1999 contract, allowing ESP customers to decide whether they would participate in the optional FSP program, which would provide them more reliable power at a higher price. This evidence is rather persuasive, although standing alone it is not enough for the court to grant summary judgment in favor of plaintiffs. After considering the extrinsic evidence, the court has determined that there are material questions of fact precluding summary judgment for either party if a reviewing court finds that

the contract is ambiguous.

For all of the foregoing reasons, the court finds that the contractual terms at issue in this case are not ambiguous but that there are genuine issues of material fact regarding defendant's affirmative defenses precluding entry of summary judgment for either party.  A separate order will be entered.

**DONE** this the 31st day of July, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

35